Filing # 48124557 E-Filed 10/26/2016 02:37:18 PM

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA                                    CIVIL ACTION

CAROLINE WATERS, ANTHONY
MITCHELL, JOYCE DUNCAN, ANGELA
MANN, NATALIE FALDO, CLARISSA
HOBDEN, GARETH PERRY, SANDRA
CHAU, LAKSHMAN PAIDI, DANIEL
KHABBAZI, SRIRATNA KONERU,
ARMANDO CASON, FERNANDO DE
SALVIDEA, ANTONY SUTTON, CHRIS
MERCER, ROBERT CONNORS, PETER
POULSEN, JOHN PETER DUTHOIT,
ROLAND LANCTOT, MAURICE PRICE,
ANGELICA CHAIN, CARLOS DUARTE,
DAVID MALCHER, CHARMAINE ENSLIN,
AND JORGE SALAS,

Case No. 16- _____

2:16-CV-847-FtM-29CM

     Plaintiffs,

        v.

RAYMOND JAMES & ASSOCIATES, INC., a
Florida corporation.

     Defendant.

## COMPLAINT

**Plaintiffs**, Caroline Waters, Anthony Mitchell, Joyce Duncan, Angela Mann,

Natalie Faldo, Clarissa Hobden, Gareth Perry, Sandra Chau, Lakshman Paidi, Daniel

Khabbazi, Sriratna Koneru, Armando Cason, Fernando De Salvidea, Antony Sutton,

Chris Mercer, Robert Connors, Peter Poulsen, John Peter Duthoit, Roland Lanctot,

Caroline Waters, Maurice Price, Angelica Chain, Carlos Duarte, David Malcher,

Charmaine Enslin, and Jorge Salas, sue **Defendant**, Raymond James & Associates, Inc.

("Raymond James"), and state:

## GENERAL ALLEGATIONS

### Jurisdiction and Venue

1.    This is an action for damages that exceeds Fifteen Thousand Dollars ($15,000), exclusive of interest, costs, and attorneys' fees.

2.    Defendant, Raymond James is a Florida corporation which operates, conducts, engages in, carries on business ventures in the State of Florida and which are engaged in substantial and not isolated activity within the state.

3.    Pursuant to Fla. Stat. § 47.051 (2015), venue is proper in Collier County, Florida as Defendant, Raymond James has, or usually keeps, an office for transaction of its customary business in Collier County.

4.    Pursuant to Fla. Stat. § 47.011 (2015), several of the Plaintiffs also reside in Collier County, Florida for purposes of establishing venue and where the cause of action accrued.

### Introduction

5.    This is an action arising out of the misuse of certain investments made by the Plaintiffs through the EB-5 Investor Program. Defendant, Raymond James, along with Ariel Quiros ("Quiros") and William Stenger ("Stenger"), misused and stole the Plaintiffs', Phase I investors, investment money through an intricate web of transfers and margin loans meant to defraud. Due to the fraudulent scheme, and with the direct assistance of Raymond James, Quiros and Stenger have misused over $200 million and systematically looted over $50 million of the more than $350 million that was raised from hundreds of investors through the U.S. Citizenship and Immigration Services' EB-5 Immigrant Investor Program.

[12385-0006/2586060/2]                    2

6.      Quiros and Stenger, through Q Resorts, Inc., and Jay Peak, Inc., attracted foreign investors hoping to earn permanent residence in the United States through investing in U.S. projects that create a certain number of jobs. Quiros and Stenger structured these ostensible investments as limited partnerships, whereby each limited partnership would use its investors' funds for specific purposes under certain restrictions. The fraudulent scheme took the form of seven limited partnership securities offerings: Suites Phase I, Hotel Phase II, Penthouse Phase III, Golf and Mountain Phase IV, Lodge and Townhouses Phase V, Stateside Phase VI, Biomedical Phase VII, and Q Burke (collectively, the "Jay Peak Limited Partnerships"). A true and correct copy of the Private Offering Memorandum is attached as Exhibit "1."

7.      Investors who invested in these limited partnerships thought they were investing their funds in hotels, cottages, a biomedical research facility and other projects. Specifically, the Plaintiffs, Suites Phase I investors, were led to believe that their individual $500,000 investment would be used strictly to develop and construct a hotel in Jay, Vermont, rather than used, through commingling and misuse, as Quiros' own personal cash account. In reality, while some of the funds were used for the projects, the majority of the funds were commingled, misused, and diverted to pay for other projects and to cover Quiros' personal expenses. The Jay Peak Limited Partnerships' money was also improperly converted into collateral for loans to Quiros by Defendant, Raymond James. Raymond James enabled Quiros and Stenger's attempts to disguise the fact that most of the seven projects were either over budget or experiencing shortfalls. In doing so, Raymond James profited from the fraudulent scheme.

[12385-0006/2586060/2]                    3

8.    Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things:

   (a)    finance his purchase of the Jay Peak resort;

   (b)    back a personal line of credit to pay his income taxes;

   (c)    purchase a luxury condominium;

   (d)    pay taxes of a company he owns; and

   (e)    buy an unrelated resort. Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) that he set up in the name of the Jay Peak Limited Partnership at Raymond James.

9.    All thirty-five (35) of the Suites Phase I investors' funds totaling $17.5 million, were held in accounts at Raymond James managed by Quiros' then son-in-law, Joel Burstein ("Burstein"). As the broker for the accounts holding Jay Peak Limited Partnership funds, Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the Jay Peak Limited Partnerships.

10.    Defendant, Raymond James and Burstein:

   (a)    knew that the funds in the Raymond James accounts belonged to investors;

   (b)    knew that the Jay Peak General Partners owed fiduciary duties to the investors in the Jay Peak Limited Partnerships; and (3) together with Quiros and Stenger, aided and abetted the breach of fiduciary duty by margining investors' assets, assisting Quiros steal the investors' funds for his own use, and commingling investors' funds in breach of the partnership agreements.

## Parties and Relevant Nonparties

### Plaintiffs

11.   Plaintiff, Caroline Walters is an individual who resides in Collier County, Florida and invested $500,000 pursuant to the EB-5 program described herein as well as a $50,000 administrative fee.

12.   Plaintiff, Antony Mitchell is a natural person over the age of 21 and is otherwise sui juris. Mr. Mitchell resides in Boynton Beach, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

13.   Plaintiff, Joyce Duncan is a natural person over the age of 21 and is otherwise sui juris.  Ms. Duncan resides in Willow, Alaska. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

14.   Plaintiff, Angela Mann is a natural person over the age of 21 and is otherwise sui juris.  Ms. Mann resides in Fresno, California.  Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

15.   Plaintiff, Natalie Faldo is a natural person over the age of 21 and is otherwise sui juris.  Ms. Faldo resides in North Hollywood, California.  Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay

Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

16. Plaintiff, Clarissa Hobden is a natural person over the age of 21 and is otherwise sui juris. Ms. Hobden resides in Boulder, Colorado. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

17. Plaintiff, Gareth Perry is a natural person over the age of 21 and is otherwise sui juris. Mr. Perry resides in Cedar Creek, Texas. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

18. Plaintiff, Sandra Chau is a natural person over the age of 21 and is otherwise sui juris. Ms. Chau resides in Renton, Washington. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

19. Plaintiff, Lakshman Paidi is a natural person over the age of 21 and is otherwise sui juris. Ms. Paidi resides in Renton, New Jersey. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

20. Plaintiff, Daniel Khabbazi is a natural person over the age of 21 and is otherwise sui juris. Mr. Khabbazi resides in Clover, South Carolina. Plaintiff entered into

a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

21.    Plaintiff, Sriratna Koneru is a natural person over the age of 21 and is otherwise sui juris. Ms. Koneru resides in Irving, Texas. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

22.    Plaintiff, Armando Cason is a natural person over the age of 21 and is otherwise sui juris. Mr. Cason resides in McKinney, Texas. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

23.    Plaintiff, Fernando de Salvidea is a natural person over the age of 21 and is otherwise sui juris. Mr. de Salvidea resides in Woodlands, Texas. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

24.    Plaintiff, Anthony Sutton is a natural person over the age of 21 and is otherwise sui juris. Mr. Sutton resides in the United Kingdom. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

25.    Plaintiff, Chris Mercer is a natural person over the age of 21 and is otherwise sui juris. Mr. Mercer resides in the United Kingdom. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

26.    Plaintiff, Robert Connors is a natural person over the age of 21 and is otherwise sui juris. Mr. Connors resides in the United Kingdom. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

27.    Plaintiff, Peter Poulsen is a natural person over the age of 21 and is otherwise sui juris. Mr. Poulsen resides in Conroe, Texas. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

28.    Plaintiff, John Peter Duthoit is a natural person over the age of 21 and is otherwise sui juris. Mr. Duthoit resides in Aventura, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

29.    Plaintiff, Roland Lanctot is a natural person over the age of 21 and is otherwise sui juris. Mr. Lanctot resides in The Villages, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak

Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

30.   Plaintiff, Maurice Price is a natural person over the age of 21 and is otherwise sui juris. Mr. Price resides in Port Charlotte, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

31.   Plaintiff, Angelica Chain is a natural person over the age of 21 and is otherwise sui juris. Ms. Chain resides in Collier County, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

32.   Plaintiff, Carlos Duarte is a natural person over the age of 21 and is otherwise sui juris. Mr. Duarte resides in Bonita Springs, Florida. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

33.   Plaintiff, David Malcher is a natural person over the age of 21 and is otherwise sui juris. Mr. Malcher resides in Alpharetta, Georgia. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

[12385-0006/2586060/2]                            9

34.   Plaintiff, Charmain Enslin is a natural person over the age of 21 and is otherwise sui juris. Ms. Enslin resides in Peachtree Corners, Georgia. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Phase II L.P. ("Suites Phase II"), and has been damaged as a result of the Defendant's conduct.

35.   Plaintiff, Jorge Salas is a natural person over the age of 21 and is otherwise sui juris. Mr. Salas resides in Venezuela. Plaintiff entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites L.P. ("Suites Phase I"), and has been damaged as a result of the Defendant's conduct.

36.   Plaintiffs each invested $500,000, pursuant to the Private Offering Memorandum (Exhibit "1").

**Defendants**

37.   Defendant, Raymond James & Associates, Inc. is a corporation organized and existing under the laws of the State of Florida.

**Relevant Nonparties**

38.   Jay Peak, Inc. ("Jay Peak") is a Vermont corporation with its principal place of business in Jay, Vermont. Jay Peak operates the Jay Peak Resort in Jay, Vermont which includes the first six projects for which Quiros and Stenger raised money. Jay Peak, in conjunction with others, has served as the manager or developer of the projects.

39.   Q Resorts, Inc. ("Q Resorts") is a Delaware corporation with its offices in Miami, Florida. Quiros is the sole owner, officer and director of Q Resorts. Q Resorts is the sole owner of Jay Peak. Q Resorts acquired Jay Peak from the Canadian firm, Mont

Saint-Sauveur International, Inc., in 2008, and Quiros has since overseen the various Jay Peak projects through Q Resorts.

40.    Stenger is a citizen of the State of Vermont. Stenger is the Director, President and CEO of Jay Peak. He is the president and director of the general partner of the first Jay Peak project offering, and is the sole officer or director of the general partner of the second through sixth offerings. All six offerings were set up as limited partnerships. Stenger is, along with Quiros, a principal in the Jay Peak Biomedical general partner, the seventh offering.

41.    Quiros is a citizen and resident of the State of Florida. In addition to being the sole owner, officer and director of Q Resorts, he is the chairman of Jay Peak. Through those two companies, Quiros controlled each of the Jay Peak General Partners and Limited Partnerships. He is a principal of the general partner of the Jay Peak Biomedical limited partnership offering, which is the seventh and most recent project offering.

42.    Burstein is a citizen of the State of Florida. He is a natural person over the age of 21 and otherwise *sui juris*. Burstein is Quiros' former son-in law and the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex. He manages three Raymond James locations: Miami, Miami Beach, and Dadeland.

43.    Jay Peak Hotel Suites, L.P. ("Suites Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.

44.    Jay Peak Hotel Suites Phase II, L.P. ("Hotel Phase II") is a Vermont limited partnership with is principal place of business in Jay, Vermont. Between March 2008 and January 2011, Hotel Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

45.    Jay Peak Management, Inc. ("Jay Peak Management") is a Vermont corporation which is the general partner of Suites Phase I and Hotel Phase II. It is also a wholly-owned subsidiary of Jay Peak. Stenger is the company's president.

46.    Jay Peak Penthouse Suites, L.P. ("Penthouse Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Penthouse Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55 unit "penthouse suites" hotel and an activities center, including a bar and restaurant.

47.    Jay Peak GP Services, Inc. ("Jay Peak GP Services"), is a Vermont corporation and the general partner of Penthouse Phase III. Stenger, listed as the director, is its only principal.

48.    Jay Peak Golf and Mountain Suites, L.P. ("Golf and Mountain Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Golf and Mountain Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

49. Jay Peak GP Services Golf, Inc. ("Jay Peak GP Services"), is a Vermont corporation and the general partner of Golf and Mountain Phase IV. Stenger, listed as the director, is its only principal.

50. Jay Peak Lodge and Townhouses, L.P. ("Lodge and Townhouse Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Lodge and Townhouses Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a cafe, and a parking garage.

51. Jay Peak GP Services Lodge, Inc. ("Jay Peak GP Services Lodge"), is a Vermont corporation and the general partner of Lodge and Townhouses Phase V. Stenger, listed as the director, is its only principal.

52. Jay Peak Hotel Suites Stateside, L.P. ("Stateside Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Stateside Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

53. Jay Peak GP Services Stateside, Inc. ("Jay Peak GP Services Stateside"), is a Vermont corporation and the general partner of Stateside Phase IV. Stenger, listed as the director, is its only principal.

54. Jay Peak Biomedical Research Park, L.P. ("Biomedical Phase VII") is a Vermont limited partnership with its principal place of in Newport, Vermont. Since November 2012, Biomedical Phase VII has raised approximately $83 million from 166

investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.

55.    AnC Bio Vermont GP Services, LLC ("AnC Bio Vermont GP Services"), is a Vermont limited liability company and the general partner of Biomedical Phase VII. Its managing members are Quiros and Stenger.

56.    Q Burke Mountain Resort, Hotel and Conference Center, L.P. ("Q Burke Mountain Resort") is a Vermont limited partnership with its principal place of business in East Burke, Vermont. As of September 2015, Q Burke Mountain Resort raised approximately $53.5 million from investors through an EB-5 offering of limited partnership interests to purchase land and develop a hotel and other facilities.

57.    Q Burke Mountain Resort GP Services, LLC ("Q Burke GP Services") is a Vermont limited liability company and the general partner of Q Burke Mountain Resort. Its managing members are Quiros and Stenger.

58.    Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLP are collectively referred to as the "Jay Peak General Partners."

59.    Jay Peak, Q Resorts, Suites Phase I, Hotel Phase II, Jay Peak Management, Penthouse Phase III, Jay Peak GP Services, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Lodge and Townhouse Phase V, Jay Peak GP Services Lodge, Stateside Phase VI, Jay Peak GP Services Stateside, Biomedical Phase VII, AnC Bio Vermont GP Services, Q Burke Mountain Resort, Q Burke GP Services, Jay Construction Management, Inc., GSI of Dade County, Inc., North East Contract Services,

Inc., and Q Burke Mountain Resort, LLC are collectively referred to as the "Jay Peak Entities".

### The EB-5 Investor Program

60. The United States Congress created the EB-5 Immigrant Investor Program in 1990 in an effort to boost the U.S. economy. The Program provides a prospective immigrant with the opportunity to become a permanent resident by investing in the U.S.

61. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million, depending on the type of investment, in a commercial enterprise approved by the U.S. Citizenship and Immigration Service ("Immigration Service"). Once he or she has invested, the foreign applicant may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card. The applicant can then live and work in the U.S. permanently.

62. A certain number of EB-5 visas are set aside for prospective immigrants who invest through what is known as a Regional Center. An applicant only has to invest $500,000 if he or she invests through a Regional Center.

63. The State of Vermont EB-5 Regional Center has been a federally-designated Regional Center since 1997. As a Regional Center, the state has approved all EB-5 projects within the state and has entered into an understanding with the issuers of EB-5 projects, including Jay Peak. The Vermont Agency of Commerce and Community Development has, until recently, administered the state's EB-5 program. The Vermont Division of Financial Regulation now shares that responsibility with the Agency.

{12385-0006/2586060/2}                                    15

## The Jay Peak EB-5 Offerings

64.    Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time, it has raised more than $350 million from more than 700 investors from at least 74 countries. The seven separate offerings have involved the construction and development of hotels, a ski resort and lodges, recreation and meeting facilities, restaurants, and a biomedical research facility.

65.    Foreign investors' interest in becoming involved with the EB-5 program is twofold: obtaining their green card and achieving a return on their investment. In his communications with the Jay Peak investors, Stenger touted the individual projects' ability to make a two (2) to six (6) percent annual return once they were complete and operating.

66.    To become involved in the Jay Peak investment project, interested investors in each of the partnerships would generally put down a $10,000 deposit, which went towards their $500,000 investment. The investors would then receive from Jay Peak, and often from Stenger, offering materials that consisted of a private placement memorandum, a business plan, and a limited partnership agreement.

67.    By way of example, the Suites Phase I investors were given a document entitled "Source and Use of Investor Funds" which explained how the $17.5 million raised from the investors would pay for the project. The document broke down the costs as $10.4 million for construction, $1.6 million for operating systems and equipment, $800,000 for utilities and common areas, $1.8 million for purchase of the land, approximately $600,000 for contingencies, and approximately $400,000 for working capital. The remaining $1.9 million would go to Jay Peak in developer fees.

[12385-0006/2586060/2]                    16

68. The investors were also provided with a limited partnership agreement which outlined the rights, obligations, and responsibilities of the general partner for each project as well as for the investors. Each limited partnership agreement, which all investors either signed or adopted, contains several provisions regarding how Jay Peak and the general partner can use investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership; or (3) mortgaging, conveying or encumbering partnership property that was not real property.

69. Stenger reviewed, was responsible for, and had authority over the contents of the offering documents in Phases I-VI, including the limited partnership agreements and the use of proceeds documents. Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them.

70. The Suites Phase I investors each made a $500,000 investment in the Hotel Phase along with an additional $50,000 administrative fee.

71. Each project had an escrow account at People's United Bank in Vermont (formerly known as the Chittenden Trust Company). Stenger was a signatory on all of the People's Bank accounts and routinely authorized the transfer of funds into and out of those accounts.

72. The initial $500,000 investment normally was deposited into the People's Bank account for the specific project in which the investor was participating. Once the Immigration Service approved the investor's initial or provisional green card, Stenger

typically had the $500,000 transferred to a Raymond James account that was set up in the name of the particular project through Raymond James' Coral Gables office.

73.    Stenger had no signatory or other authority over the Raymond James accounts. Rather, Quiros opened all of the Raymond James accounts, and had sole and exclusive authority over them.

74.    Quiros and Stenger, with the assistance of Raymond James and Burstein, oversaw and directed the use of all investor funds and the development and construction of all projects. Investors played no role in the development, construction, or operation of the facilities.

75.    In direct violation of the limited partnership agreements, Stenger and Quiros misused, misappropriated, and commingled investor funds from the different projects. Rather than using investor funds as described in the use of proceeds documents, Stenger and Quiros frequently commingled and misused Suites Phase I investor funds by causing the funds to flow in a circular and roundabout manner among various accounts and entities.

### Fraudulent Use of Investor
### Funds to Finance Quiros' Purchase of Jay Peak

76.    Jay Peak was originally owned by a Canadian firm, Mont Saint-Sauveur International, Inc. ("MSSI"), which oversaw the Suites Phase I securities offering. Stenger worked for MSSI at the time and oversaw the offering as the principal of Jay Peak Management, the general partner of Suites Phase I and Hotel Phase II. Suite Phase I raised $17.5 million from 35 investors from December 2008 through May 2008.

77.    From January through June 2008, Quiros negotiated and finalized a stock transfer agreement between MSSI and Q Resorts (Quiros' own company), in which MSSI

agreed to transfer the real estate and other assets of Jay Peak to Q Resorts. The agreement was signed on June 13, 2008, and the parties closed on the deal ten days later, June 23, 2008, for a final price of $25.7 million.

78.    In preparation for the closing, Quiros asked MSSI representatives to open brokerage accounts at Raymond James with Burstein, his son-in-law, in the names of the Suites Phase I and Hotel Phase II limited partnerships. MSSI representatives agreed, and Stenger opened a Suites Phase I account at Raymond James on May 20, 2008. A month later, on June 20, 2008, he opened a Hotel Phase II account at Raymond James.

79.    Quiros testified under oath in front of the SEC that "Raymond James was a great supporter of mine. They're the ones who developed my banking structure in 2008 . . . . [Raymond James] put this structure together for me." Quiros also testified that Raymond James put together the margin loans for Quiros to acquire Jay Peak.

80.    As admitted by Burstein in his testimony before the SEC, Burstein and Quiros discussed financing the purchase of Jay Peak using a margin loan. Frank Amigo (Burstein's supervisor and current Managing Director for Raymond James's South Florida Complex) also participated in that conversation. Quiros, Burstein, and Amigo discussed how the margin loan would work - Raymond James would use the investors' funds in the Raymond James accounts, collateralize those investors' funds per Quiros' authorization, and give Quiros a loan based on the assets available. They also discussed holding investors' funds in the form of Treasury bills and the amount of collateral Quiros could utilize with Treasury bills. Raymond James allowed Quiros to collateralize 90% of the funds in the Jay Peak Limited Partnerships' accounts at Raymond James. Accordingly, Raymond James allowed Quiros to borrow 90% of the investors' funds in

the Jay Peak Limited Partnership accounts. Raymond James was protected if Quiros did not pay back the margin loan, Raymond James would take the investors' funds in the form of Treasury Bills and be made whole.

81.    On June 16 and 17, 2008, in preparation for closing, MSSI transferred $11 million in Suites Phase I investor funds from People's Bank to Raymond James. Three days later, on June 20, MSSI transferred $7 million in Hotel Phase II investor funds from People's Bank to Raymond James.

82.    In conjunction with those transfers, MSSI representatives on June 18, 2008, wrote a letter to Burstein, with copies to Quiros and Stenger, among others, stating that:

> "The funds in the MSSI Raymond James Suites Phase I account were investor funds. "These funds were invested by immigrant investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I understand has already been provided to you. **You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts, Inc.'s purchase of] the Jay Peak Resort."** (emphasis added).

> Any money transferred to the Raymond James Hotel Phase II account similarly consisted of investor funds. **'Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.'"** (emphasis added).

83.    Raymond James knew that the monies in the Jay Peak Limited Partnership accounts were investor funds and could not be used by Quiros for Quiros' purchase of Jay Peak.

84.    Despite the fact that MSSI clearly explained to Quiros and Stenger that they could not use investor money to purchase Jay Peak, Quiros, aided by transfers made by Stenger and by Burstein and Raymond James, did exactly that. Over the

next two months Quiros, through Q Resorts, used $21.9 million of investor funds - $12.4 million from Suites Phase I and $9.5 million from Hotel Phase II to fund the vast majority of his purchase of Jay Peak.

85.    Quiros began his fraudulent use of investor funds on June 17, the day before the MSSI letter, when he opened two accounts at Raymond James under his name and control, one each for Suites Phase I and Hotel Phase II. On the day of closing, June 23, MSSI transferred the $11 million in its Suites Phase I account at Raymond James to Quiros' new Suites Phase I account. The same day, MSSI transferred the $7 million in its Hotel Phase II account at Raymond James to Quiros' new Hotel Phase II account. MSSI closed the two Raymond James accounts within days, leaving Quiros in total control of investor money. Stenger, as the sole principal of the Suites Phase I and Hotel Phase II general partners, knew he was supposed to control investor funds. Yet, he willingly allowed Quiros to take control of the funds, abdicating the responsibilities clearly laid out for him in the limited partnership agreements.

86.    Also on the day of closing, June 23, 2008, Quiros transferred $7.6 million of Suites Phase I investor funds from the Suites Phase I Raymond James account and $6 million of Hotel Phase II investor funds from the Hotel Phase II Raymond James account to another account (previously empty) that he had just opened at Raymond James in the name of Q Resorts. He completed his first fraudulent transfer the same day when he wired $13.544 million from the Q Resorts accounts to the law firm representing MSSI as partial payment for the Jay Peak purchase.

87.    Over the next three months, Quiros made four additional payments totaling $5.5 million from the Q Resorts account to the same law firm as continued payment for

the Jay Peak purchase. The specific payments were $1.5 million on July 1, 2008, $1 million on August 29, 2008, $500,000 on September 5, 2008, and $2.5 million on September 26, 2008.

88.    Quiros made three additional transfers from the Q Resorts account totaling $2.9 million - $2 million on June 25, 2008, $628,684 on June 26, 2008, and $263,000 on September 3, 2008 - all to the law firm that had represented Q Resorts in the purchase.

89.    Quiros and Q Resorts made all of these payments improperly using investor funds. For example, to fund the $2 million payment to Q Resorts' law firm on June 25, 2008, Quiros transferred $2 million derived from Suites Phase I investor funds from the Suites Phase I Raymond James account to the Q Resorts account, then immediately wired that $2 million to the Q Resorts' law firm. The next day he arranged the transfer of just under $300,000 each from the Suites Phase I and Hotel Phase II Raymond James accounts to the Q Resorts account, which he used to send $628,684 to the law firm.

90.    Stenger facilitated many of these payments by transferring additional money to the Raymond James accounts. For example, on July 1, 2008, Stenger authorized the transfer of $1 million of Suites Phase I investor funds from a Suites Phase I account at People's Bank to the Q Resorts account at Raymond James. The same day he authorized the transfer of $600,000 in Hotel Phase II investor funds from the Hotel Phase II account at People's Bank to the Q Resorts account. Quiros turned right around and wired $1.5 million of that money to the law firm representing MSSI.

91.    Subsequent transactions followed a similar pattern - Stenger transferring Suites Phase I or Hotel Phase II money from People's Bank either to the Suites Phase I

and Hotel Phase II accounts or to the Q Resorts account at Raymond James, and Quiros using that money to pay either Q Resorts or MSSI's law firm. In addition, to facilitate some of these payments, Quiros transferred Phase I and II investor funds between the Suites Phase I and Hotel Phase II accounts at Raymond James.

92.     The limited partnership agreements and the use of proceeds documents for Phases I and II, all provided to investors before they invested, prohibited this use of investor funds. For example, there was nothing in the use of proceeds document allowing Quiros or Suites Phase I to use $12.4 million of Phase I investor money to purchase Jay Peak. Likewise, the Hotel Phase II use of proceeds document given to investors, entitled Estimated and Projected Cost of Development, showed a detailed breakdown of how Jay Peak would spend the $75 million it raised from investors. There was nothing in this document that allowed Quiros or Hotel Phase II to use $9.5 million of Phase II investor funds to buy Jay Peak.

93.     The use of investor funds to purchase Jay Peak also contravened prohibitions in the Suites Phase I and Hotel Phase II limited partnership agreements. Each agreement contained a Section 5.02, entitled "Limitations on the Authority of the General Partner." That section in each agreement prevented the general partner from borrowing or commingling limited partnership funds and from making the type of purchase Quiros and Q Resorts made of Jay Peak without proper limited partnership consent.

### Raymond James' Involvement in the
### Improper Use of Investor Funds for Margin Loans

94.     Raymond James, Quiros, and Burstein discussed and were actively involved in the use of limited partnership funds as collateral for loans made to Quiros. Specifically, Raymond James collateralized the limited partnership funds per Quiros'

authorization, and then gave Quiros a loan based on the assets available. Raymond James, Quiros, and Stenger knew that the funds in the Jay Peak Limited Partnership accounts were being used as collateral for margin loans.

95.     Quiros and Raymond James' use of margin loans began in June 2008. When Quiros opened the Raymond James Suites Phase I and Hotel Phase II accounts, Quiros signed a credit agreement with Raymond James to allow both accounts to hold margin balances – meaning the accounts could borrow money (which would have to be paid back with interest) and hold negative cash balances. Put another way, the accounts went into debt to Raymond James when they incurred margin balances.

96.     The credit agreement Quiros signed pledged amounts in both Suites Phase I and Hotel Phase II accounts, as well as all of the assets of the Suites Phase I limited partnership, as collateral for any margin loans the accounts incurred. As Jay Peak began new offerings, Quiros opened new accounts at Raymond James in the name of each new Jay Peak Limited Partnership, to which Stenger transferred limited partnership funds from the corresponding account at People's Bank where the initial investors deposited their money.

97.     For example, the Phase I investors sent their respective $500,000 investments to an escrow account at People's Bank in the name of Suites Phase I. Stenger had signatory authority and control over that account. When the offering began, Quiros opened an account at Raymond James in the name of Suites Phase I, over which only he had signatory authority and control. Once Suites Phase I investors had their conditional green cards approved, Stenger approved the transfer of those investors' $500,000 deposits to the Suites Phase I Raymond James account, thereby giving up

control over that money to Quiros. Each time this happened, Stenger violated the terms of the limited partnership agreements. Stenger, as the principal of the general partner in Phases I-VI, always had the ultimate responsibility for the overall management and control of the business assets and affairs of the six limited partnerships, and the obligation to place partnership funds in accounts in the names of the partnerships. Stenger abdicated these responsibilities by giving Quiros complete control of the partnerships' funds and by placing investor funds in accounts to which he did not have access.

98.    The process in Phases II and IV-VII worked the same way. Furthermore, each time he opened a new Raymond James account, Quiros signed a new credit agreement pledging the assets of that account - in each case comprised of or derived from limited partnership funds - as collateral for the margin loans he continued to hold at Raymond James. Quiros signed a credit agreement on February 6, 2009, pledging limited partnership funds in the Suites Phase I and Hotel Phase II Raymond James accounts as collateral for the margin loans. He signed one on October 1, 2010, expanding the list of accounts to Penthouse Phase III and Q Resorts. Quiros signed a credit agreement on February 10, 2011, adding the account for Golf and Mountain Phase IV. He signed the next one on August 25, 2011, adding the account for Lodge and Townhouses Phase V. On February 28, 2012, he signed a credit agreement adding the account for Stateside Phase VI as collateral for the margin loans. And on August 5, 2013, Quiros signed a credit agreement adding the accounts for Biomedical Phase VII and another Quiros entity.

99.    Thus, in every offering, Quiros put limited partnership funds at risk by pledging them as collateral for the margin loans. Raymond James could have insisted on payment of the margin loans, and Quiros would have had no choice but to pay them off

with limited partnership funds slated for use to construct the various projects unless he could come up with a replacement source of funding. And, as described below, Quiros eventually paid off the margin loans using limited partnership funds.

100.    Quiros' establishment of the margin loans violated the terms of each of the Jay Peak Limited Partnership agreements (which Stenger and/or Jay Peak provided to all investors). Those agreements specifically prohibited the projects' general partners from encumbering or pledging partnership funds as collateral without the express approval of the investors. Furthermore, none of the offering documents provided to the Suites Phase I investors said that any of the limited partnerships, general partners, Quiros, Stenger, Q Resorts, or Jay Peak could pledge investor funds as collateral for loans. In fact, the use of proceeds document in every offering, which set forth exactly how the investors' partnership funds would be spent, did not provide for use of such funds as collateral for or to pay off margin loans.

101.    Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. Raymond James and Burstein actively helped Quiros hide the fact that investors' monies were missing from the Jay Peak Suites Phase I and Hotel Phase II accounts because Quiros had improperly used investor funds to purchase Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that partnership funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I funds MSSI had transferred to Quiros' Suites Phase I account. But, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of

Jay Peak, there were only $3.4 million in partnership funds left in the Suites Phase I account. Therefore, Quiros' Suites Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). Under terms of the credit agreement Quiros had signed, that $7.6 million was actually a debt to Raymond James. Thus, Suites Phase I did not have a claim to the $11 million in Treasury Bills, and the $3.4 million in investor funds still in the Suites Phase I account was at risk of being forfeited to Raymond James if there was a margin call.

102.    Quiros undertook the same acts in the Hotel Phase II account at Raymond James on the same day. On June 25, 2008, Quiros ordered the purchase of $7 million in Treasury Bills in that account. Again, this amount matched the $7 million of Hotel Phase II funds MSSI had transferred to Quiros' Hotel Phase II account. But again, Quiros had already transferred $6 million of that amount out of the account to pay for Q Resorts' purchase of Jay Peak. There was only $1 million in partnership funds left in the Hotel Phase II account. Therefore, Quiros' Hotel Phase II account had to incur a margin loan balance of $6 million to buy Treasury Bills (the difference between the $1 million in the account and the $7 million purchase). Under the terms of the credit agreement Quiros had signed, that $6 million was actually a debt to Raymond James. Hotel Phase II did not have a claim to the full $7 million in Treasury Bills, and the $1 million in partnership funds still in the Hotel Phase II account was at risk of being forfeited to Raymond James if there was a margin call.

103.   Quiros continued to make use of the margin loans in the Suites Phase I and Hotel Phase II accounts at Raymond James to pay the remainder of the purchase price for Jay Peak between June and September 2008.

104.   Furthermore, on at least one other occasion between June and September 2008 Quiros directed the purchase of an additional $1.5 million in Treasury Bills in the Suites Phase I account at Raymond James to match an amount of Suites Phase I investor funds the account had received from People's Bank. Stenger had authorized transfer of the funds from People's Bank. Again, the purchase was a scam, as Quiros had already transferred $1 million of the $1.5 million out of the account to pay for the purchase of Jay Peak, leaving the Treasury Bills not as belonging to the investors, but as collateral for the margin loan balance to Raymond James.

105.   From October 2008 until February 2009, Quiros continued to maintain the margin loan balances in his Suites Phase I and Hotel Phase II accounts at Raymond James, with partnership funds pledged as collateral in violation of the Phase I and II use of proceeds documents and the limited partnership agreements. By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million. Stenger had continued to authorize transfers of investor funds from the People's Bank Phase I and II accounts to the Raymond James accounts, which then became collateral for the margin loans.

106.   That month, Quiros consolidated the two margin loans into one (Margin Loan III), and signed a new credit agreement that continued to pledge Phase I and II partnership funds to back the margin loan balance. Over the next three years, Quiros signed the aforementioned credit agreements pledging partnership funds from Phases

III-VI as collateral. He also used more than $105 million of partnership funds from Phases I-V towards paying down Margin Loan III, broken down as follows: approximately $2.2 million from Suites Phase I, approximately $51.6 million from Hotel Phase II, approximately $32.5 million from Penthouse Phase III, approximately a net amount of $15.8 million from Golf and Mountain Phase IV, and approximately $5.6 million from Lodge and Townhouses Phase V.

107.    Margin Loan III continued to be backed by Suites Phase I and Hotel Phase II investor funds, putting them at risk, until February 2012. In addition, during this same time, Quiros and. Stenger commingled Suites Phase I partnership funds with other projects. For example, on October 3, 2011, Stenger authorized a transfer of $49,000 from the Penthouse Phase III account at People's Bank to the People's Bank Suites Phase I account. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the Suites Phase I account to the Hotel Phase II account, both at People's Bank.

108.    Because Quiros continued spending money from the margin loan account at Raymond James, the Margin Loan III balance remained at approximately $23 million in February 2012. On February 24, 2012, Quiros transferred approximately $22.4 million of investor funds from the Q Resorts account at Raymond James to pay off the $23.4 million balance. The $22.4 million of investor funds is broken down as follows: $5.8 million of this amount came from Stateside Phase VI, and approximately $16.6 million of this amount came from Lodge and Townhouses Phase V.

109.    However, just four days after paying off Margin Loan III, on February 28, 2012, Quiros opened yet another margin loan account in the name of Jay Peak at Raymond James (Margin Loan IV). This time, he signed a credit agreement pledging

investor partnership    funds in accounts from Lodge and Townhouses Phase V and Stateside Phase VI as collateral for the margin loan balances. In August 2013, he added the accounts of Jay Construction Management, Inc. (an entity controlled by Quiros) and Biomedical Phase VII, and reconfirmed the account of Q Resorts to a new credit agreement.

110. From February 2012 through March 2014, Quiros used more than $6.5 million of partnership funds from Phases V-VI towards paying down the Raymond James ·Margin Loan IV. However, because Quiros spent approximately $25.5 million on the new margin loan account on various project-related and non-project expenses, the Margin Loan IV balance was approximately $19.4 million in February 2014.

111. Raymond James then demanded that Quiros pay off Margin Loan IV. In response, on March 5, 2014, Quiros transferred approximately $18.2 million of investor funds derived from a Biomedical Phase VII account at People's Bank, which he used as part of a $19 million pay off of this margin loan. The pay down and pay off of this margin loan was a major contributor to Biomedical Phase VII project shortfalls.

112. · The margin loans at Raymond James operated from 2008 to 2014. These margin loans were always collateralized by partnership funds in violation of the Jay Peak Limited Partnership agreements.

**Raymond James Knew the Quiros and Jay Peak Transactions were Extraordinary**

113. The high number of transactions in the Jay Peak Limited Partnership accounts at Raymond James was out of the ordinary to Burstein and Raymond James.

114. In fact, Burstein and Raymond James were concerned about the high volume of wires in one of Quiros' accounts in 2011. Raymond James' Anti-Money Laundering department evaluated the account and vetted it.

115. The multiple Jay Peak Limited Partnership accounts being used as collateral for one loan was the only time Burstein had cross-margined multiple accounts to collateralize a single loan.

116. Raymond James and Burstein knew or had reason to know the transfers and margin loans orchestrated by Quiros and Stenger violated the terms of the Jay Peak Limited Partnership agreements. Raymond James and Burstein were aware or should have been aware of the use restrictions governing the partnership funds by virtue of their communications with MSSI, account opening documents pertaining to each Jay Peak Limited Partnership account, and minimal due diligence regarding the source of the funds transferred and collateralized that would have revealed Quiros and Stenger's fraudulent scheme.

117. As early as 2012, Raymond James and Burstein were on notice of the emerging allegations in the press against Quiros and Stenger regarding misuse of investor funds. For example, in Spring 2012, Douglas Hulme, a former business consultant who worked closely with Jay Peak warned immigration attorneys of the suspected misuse of funds and spoke with Peter Shumlin's - the Governor of Vermont - administration about his concerns.

### Raymond James and Burstein were Rewarded for Aiding Quiros and Stenger's Fraud

118. Throughout the funding and development of all seven stages of the Jay Peak projects, Raymond James assisted and facilitated Quiros and Stenger's fraud by

[12385-0006/2586060/2]                    31

receiving numerous transfers including, but not limited to, interest and fee payments, granting of security interests, and deposits into Raymond James accounts and for the benefit of Raymond James. Raymond James' involvement clearly perpetuated the fraud by diverting limited partnership funds and by assisting Stenger and Quiros' commingling and misuse of investor funds.

119.    Raymond James' role in commingling funds it knew belonged to investors, and in helping Quiros and Stenger embezzle partnership funds, was neither passive nor ministerial. Raymond James played an active, instrumental role by:

(a)    allowing Quiros to use funds that Raymond James knew Quiros was not permitted to use in his purchase of Jay Peak from MSSI;

(b)    setting up margin loans for Quiros to commingle and steal partnership funds in the Jay Peak Limited Partnerships accounts; and

(c)    giving carte blanche to Quiros to do whatever he wanted with the Jay Peak Limited Partnerships' funds, including paying himself and paying off both a $23 million margin loan and a $19 million margin loan to Raymond James.

120.    In return, Raymond James and Burstein made substantial profits. Raymond James was paid interest of over $2 million on the margin loans on the Jay Peak Limited Partnership accounts. Because Raymond James and Burstein profited from the Jay Peak Limited Partnerships accounts, Raymond James and Burstein provided Quiros with substantial services and aided and abetted the Jay Peak General Partners' breaches of fiduciary duty to the Jay Peak Limited Partnerships, specifically the Suite Phase I investors.

## Count I
## Aiding and Abetting Breach of Fiduciary Duty

121.   The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

122.   The Jay Peak General Partners owed fiduciary duties to the Suite Phase I investors.

123.   The Jay Peak General Partners breached their fiduciary duties to the Suite Phase I investors by commingling, misappropriating, and misusing the Suite Phase I investors' monies.

124.   Through Q Resorts and Jay Peak, Quiros controlled each of the Jay Peak General Partners for Phases I to VI. Quiros is also a managing member of the general partner of Phase VII. Quiros, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

125.   Raymond James, either with knowledge, general awareness, or recklessness, substantially assisted or encouraged these breaches of fiduciary duty.

126.   As a result of the breaches of fiduciary duties by the Jay Peak General Partners, the Plaintiffs suffered damages.

127.   By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

WHEREFORE, Plaintiffs demand judgment against Raymond James for compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable, and such other relief this Court deems just and proper.

[12385-0006/2586060/2]                    33

## Count II
## Conspiracy to Breach Fiduciary Duty

128.    The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

129.    Raymond James, Quiros, Stenger, and Burstein are parties to a civil conspiracy.

130.    Raymond James, Quiros, Stenger, and Burstein agreed and conspired to have the Jay Peak General Partners breach their fiduciary duties to the Jay Peak Limited Partnerships, specifically the Suite Phase I investors, by commingling the Jay Peak Limited Partnerships' funds, misappropriating them, and misusing them.

131.    Raymond James, along with Quiros, Stenger, and Burstein committed overt acts in furtherance of their conspiracy, including:

(a)    Quiros misused investors' funds to purchase Jay Peak;

(b)    Quiros misused and misappropriated limited partnership funds by using them as collateral for loans, to pay off margin loans, and by misappropriating them for personal expenses;

(c)    Raymond James and Burstein allowed Quiros to use investor funds to purchase Jay Peak, and

(d)    Raymond James and Burstein provided Quiros with margin loans collateralized by Plaintiffs and investors' funds for Quiros to misappropriate and misuse.

132.    Raymond James, along with Quiros, Stenger, and Burstein's conspiracy and their respective overt acts caused the Suites Phase I investors to suffer damages, including but not limited to the loss of limited partnership funds in Jay Peak Limited Partnerships.

WHEREFORE, Plaintiffs demand judgment against Raymond James for compensatory damages in an amount to be determined at the trial of this action, together

with interest at the maximum rate allowable, and such other relief this Court deems just and proper.

### Count III
### Fraudulent Transfers Pursuant to Fla. Stat. § 726.105(1)(a)

133.    The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

134.    Quiros made transfers in the form of interest fee and cost payments from the Jay Peak Entities to Raymond James in furtherance of the fraudulent scheme described above.

135.    Quiros, both personally and on behalf of the Jay Peak Entities, made the transfers with an intent to hinder, delay, or defraud the Suite Phase I investors.

136.    Given Raymond James' role in assisting Quiros and Stenger with the scheme to defraud the Suite Phase I investors, Raymond James was not acting in good faith at the time that it received such transfers. In fact, each transfer accepted by Raymond James served only to further the scheme against the Suite Phase I investors and created more indebtedness for Quiros and the Jay Peak Entities.

WHEREFORE, Plaintiffs demand judgment against Raymond James declaring all transfers to Raymond James by the Jay Peak Entities and/or Quiros as fraudulent transfers under Florida Statute 726.105(1)(a), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

### Count IV
### Fraudulent Transfers Pursuant to Fla. Stat. § 726.105(1)(b)

137.    The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

[12385-0006/2586060/2]                        35

138.    Quiros made transfers in the form of interest fee and cost payments from the Jay Peak Entities to Raymond James.

139.    Raymond James did not provide reasonably equivalent value to the Jay Peak Entities in exchange for such transfers. Each transfer accepted by Raymond James served only to further the scheme against the Suite Phase I investors and created more indebtedness for the Jay Peak Entities.

140.    When making such transfers, Quiros and the Jay Peak Entities, through the complex series of transfers in which Quiros siphoned off partnership funds, were engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction and/or intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

141.    Given Raymond James' role in assisting Quiros and Stenger with the scheme to defraud the Suite Phase I investors, Raymond James was not acting in good faith at the time that it received such transfers. In fact, each transfer accepted by Raymond James served only to further the scheme against the Suite Phase I investors and created more indebtedness for Quiros and the Jay Peak Entities.

WHEREFORE, Plaintiffs demand judgment against Raymond James declaring all transfers to Raymond James by the Jay Peak Entities as fraudulent transfers under Florida Statute 726.105(1)(b), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

## Count V
## Fraudulent Transfers Pursuant to Fla. Stat. § 726.106(1)

142.   The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

143.   Quiros made transfers in the form of interest fee and cost payments from certain Jay Peak entities to Raymond James.

144.   Raymond James did not provide reasonably equivalent value to the Jay Peak Entities in exchange for such transfers. Each transfer accepted by Raymond James served only to further the scheme against the Suite Phase I investors and created more indebtedness for the Jay Peak Entities.

145.   The Jay Peak Entities were insolvent at the time of the transfers or became insolvent as a result of the transfers because of the underlying fraudulent scheme discussed above.

146.   Given Raymond James' role in assisting Quiros with the scheme to defraud the Suite Phase I investors, Raymond James was not acting in good faith at the time that it received such transfers. In fact, each transfer accepted by Raymond James served only to further the scheme against the Suite Phase I investors and created more indebtedness for the Jay Peak Entities.

WHEREFORE, Plaintiffs demand judgment against Raymond James declaring all transfers to Raymond James by the Jay Peak Entities as fraudulent transfers under Florida Statute 726.106(1), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

## Count VI
## Violation of Racketeer Influenced and Corrupt
## Organizations Act, 18 § U.S.C. 1962(c)

147.   The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

148.   At all relevant times, Raymond James, Quiros, Stenger, and Burstein were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

149.   The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Raymond James, Quiros, Stenger, and Burstein.

150.   The members of the RICO enterprise had a common purpose: to increase and maximize their profits by illegally diverting funds that they knew belonged to partnerships for improper and unauthorized purposes. Raymond James, Quiros, and Burstein shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

151.   Raymond James, Quiros, and Burstein conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. § § 1341 and 1343. The RICO enterprise functioned over a period of years

as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity alleged herein.

152.  Raymond James, Quiros, and Burstein each directed and controlled the enterprise's affairs through the following acts:

(a)  Quiros devised the above-described scheme to defraud the Jay Peak Limited Partnerships and divert their funds for his own personal gain using the Raymond James accounts;

(b)  Quiros and Stenger knowingly wired money out of accounts holding limited partnership funds for unauthorized purposes and for Quiros' own personal gain;

(c)  Raymond James and Burstein assisted in the diversion and misuse of partnerships funds, knowing that these funds belonged to the respective Jay Peak Limited Partnership and not to Quiros and Stenger;

(d)  Stenger told the initial investors that their investments in the individual projects would yield 2% to 6% annually, knowing that the funds would be diverted for unauthorized uses and for the benefit of Raymond James, Quiros, and Burstein.

(e)  Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the Jay Peak Limited Partnerships.

(f)  Raymond James and Burstein facilitated an intricate web of transfers among various accounts at Raymond James to disguise the fact that the majority of the seven projects were either over budget or experiencing shortfalls;

(g)  Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Jay Peak Limited Partnerships at Raymond James;

(h)  Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phase III-VI;

(i)  Raymond James was on notice of the use restrictions surrounding the Jay Peak Limited Partnership funds and willfully assisted Quiros' efforts to transfer, misuse, and commingle the funds in violation of the partnership agreements; and

[12385-0006/2586060/2]                     39

(j)   Raymond James, Quiros, and Burstein devised a plan to collateralize investors' funds for loans to Quiros.

153.   Raymond James, Quiros, and Burstein used the mails and wires in furtherance of the scheme. Stenger provided materials to investors using the mails and Raymond James, Quiros, and Burstein wired investor funds among various accounts, and for Quiros' personal expenses.

154.   As part of and in furtherance of the scheme to defraud, Raymond James, Quiros, and Burstein made material omissions and misrepresentations to the Jay Peak Limited Partnerships and the initial investors for each respective limited partnership with the intent to deceive them.

155.   Raymond James, Quiros, and Burstein had a duty to correct their misrepresentations and the mistaken impressions that arose from their omissions of material fact. Their misrepresentations and omissions were material, as they helped advance their scheme and conceal their fraud, and were designed to lull the Jay Peak Limited Partnerships into believing that their investments were legitimate. The Jay Peak Limited Partnerships and the investors would have sought to end the scheme, prevent the transfer of funds, and recover misused funds had Raymond James, Quiros, Stenger, and Burstein disclosed the true nature of their scheme, or the purposes for which the partnership funds would be or were in fact used.

156.   Because the scheme was not disclosed, and as a result of Raymond James, Quiros, and Burstein's conduct and participation in the racketeering activity alleged herein, the Jay Peak Limited Partnerships could take no action to avoid the misuse and embezzlement of their funds, causing the Jay Peak Limited Partnerships to suffer damages in the form of the loss of their respective funds.

[12385-0006/2586060/2]                                40

WHEREFORE, Plaintiffs demand judgment against Raymond James for compensatory and treble damages, attorneys' fees and costs pursuant to 18 U.S.C. § 1964, and such other relief this Court deems just and proper.

## Count VII
### Conspiracy in Violation of Racketeer Influenced and Corrupt Organizations Act, 18 § U.S.C. 1962(d)

157.    The Plaintiffs re-allege paragraphs 1 through 120 hereinabove as if fully set forth herein.

158.    At all relevant times, Raymond James, Quiros, and Burstein were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c). Raymond James, Quiros, and Burstein agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

159.    Raymond James, Quiros, and Burstein committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

160.    As a result of Raymond James, Quiros, and Burstein's violations of 18 U.S.C. § 1962(d), the Plaintiffs suffered damages in the form of loss of their respective funds.

WHEREFORE, Plaintiffs demand judgment against Raymond James for compensatory and treble damages, attorneys' fees and costs pursuant to 18 U.S.C. § 1964, and such other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.

[12385-0006/2586060/2]                                    41

Dated this __26__ day of October, 2016

LAW OFFICES OF PLACE & HANLEY, LLC

By:_____
Sara E. Hanley, Esq.
Florida Bar No. 107508
NC Bar No. 36792
Randall C. Place, Esq.
Florida Bar No. 0229090
NC Bar No.: 37736
1415 Panther Lane
Naples, Florida 34109
Telephone: (239) 455-1242
Facsimile: (888) 876-6450
Counsel for Plaintiffs
Primary email addresses:
sara_hanley@placeandhanley.com
randall_place@placeandhanley.com

COLEMAN, YOVANOVICH & KOESTER, P.A.

By:_____
Edmond E. Koester, Esq.
Florida Bar No. 87882
Matthew B. Devisse, Esq.
Florida Bar No. 119125
4001 Tamiami Trail North, Suite 300
Naples, Florida 34103
Telephone: (239) 435-3535
Facsimile: (239) 435-1218
Counsel for Plaintiffs
Primary email addresses:
ekoester@cyklawfirm.com
mdevisse@cyklawfirm.com
Secondary email addresses:
relardo@cyklawfirm.com
cykservice@cyklawfirm.com

CHEFFY PASSIDOMO P.A.

By:_____
Louis D. D'Agostino, Esq.
Florida Bar No. 0776890
Maria K. Vigilante, Esq.
Florida Bar No. 98822
821 Fifth Avenue South, Suite 201
Naples, Florida 34102
Telephone: (239) 261-9300
Facsimile: (239) 261-9782
Counsel for Plaintiffs
Primary email address:
lddagostino@napleslaw.com
mvigilante@napleslaw.com